W. Floyd MESSER, Sr., individually,
Plaintiff-Appellant,

v.

E.F. HUTTON & CO., a Delaware corporation, Raphael M. Kelly, individually, Henry Herschaft, individually, Defendants-Appellees.

No. 86–3602.

United States Court of Appeals,
Eleventh Circuit.

June 16, 1988.

A. August Quesada, Jr., Wildt, Quesada & Walker, Jacksonville, Fla., Kathleen A. McDonough, James Curt Bohling, Marshall E. Hanbury, Jay L. Witkin, Commodity Futures Trading Comm., Washington, D.C., for plaintiff-appellant.

Nicholas V. Pulignana, Jr., Mattox S. Hair, Delbridge L. Gibbs, Mary C. Wood, Marks, Gray, Conroy & Gibbs, Jacksonville, Fla., for defendants-appellees.

### ON PETITION FOR REHEARING

(Opinion Dec. 7, 1987, 11 Cir.,
833 F.2d 909).

Before JOHNSON and CLARK,
Circuit Judges, and MORGAN, Senior
Circuit Judge.

### PER CURIAM:

Upon publication of the panel opinion, the Commodity Futures Trading Commission (CFTC) moved this Court for leave to file a brief as amicus curiae in support of rehearing. The panel granted the motion and has since received the brief in addition to responses from appellant and appellees. The CFTC has raised issues with regard to the published opinion that merit additional consideration. Accordingly we grant rehearing of the panel opinion as to Sections II.A., II.B., and II.C., which are hereby replaced by the following new Sections II.A., II.B., and II.C. Rehearing is denied as to the balance of the original panel opinion.

## II. DISCUSSION

### A. Federal Securities Claims

Messer alleges liability under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. At trial, E.F. Hutton claimed that the futures trades at issue are governed by commodities laws and thus are not subject to antifraud provisions in securities laws. The district court denied E.F. Hutton's motion to strike references to the Securities Exchange Act. In its judgment n.o.v., the district court did not base liability on violation of the securities laws and made no further reference to the jurisdictional point. Messer brought this appeal in part on his Securities Act claim. Therefore we must consider the jurisdictional issue.

This case is about trades of futures of T-bonds. T-bonds are securities. *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 n. 6, 92 S.Ct. 165, 168 n. 6, 30 L.Ed.2d 128 (1971); *First Nat. Bank of Las Vegas v. Estate of Russell*, 657 F.2d 668, 672 & n. 14 (5th Cir.1981). Thus this case concerns the trading of futures of securities. Securities are regulated by the Securities Exchange Commission (SEC) and governed by securities laws. Commodity futures are regulated by the Commodities Futures Trading Commission (CFTC) and governed by commodities laws. The issue to be resolved is whether securities futures are securities and/or futures as far as the governing statutes.

This issue requires an inquiry into the relative boundaries of jurisdiction between the CFTC and the SEC as intended by

Congress. Congress specified in the Commodity Exchange Act that "[n]othing in this chapter [regulating commodity exchanges] shall be deemed to govern ... government securities, ... unless such transactions involve the sale thereof for future delivery conducted on a board of trade." 7 U.S.C.A. § 2 (West 1980). Amendments in 1974 created the CFTC and bestowed it with exclusive jurisdiction over futures trading on formal exchanges. Section 201 states that "[t]he Commission's jurisdiction over futures contract markets or other exchanges is exclusive and includes the regulation of commodity accounts, commodity trading agreements, and commodity options." 1974 U.S.Code Cong. & Admin.News 5848. The exclusive jurisdiction provision incorporated a broad definition of commodities in recognition of an expanding futures market. *Id.* at 5859. Congress explained that

> regulation by the Commission of transactions in the specified financial instruments (i.e., security warrants, security rights, resales of installment loan contracts, repurchase options, *government securities,* mortgages and mortgage purchase commitments), which generally are between banks and other institutional participants, is unnecessary, *unless executed on a formally organized futures exchange.*

*Id.* at 5863–64 (emphasis added). Thus T-bond futures traded on futures exchanges fall under the exclusive aegis of CFTC regulations.[1]

Section 201 of the 1974 Amendments included a savings clause intended to avoid CFTC infringement on SEC territory. 7 U.S.C.A. § 2. In the context of granting exclusive CFTC jurisdiction over futures

exchanges, the jurisdiction expressly was "not [to] supersede or limit the jurisdiction" of the SEC. 1974 U.S.Code Cong. & Admin.News 5848. The legislative history is clear, however, that application of this savings clause turns on whether a security is traded on a "board of trade." 1974 U.S.Code Cong. & Admin.News 5870; *see also Securities & Exchange Comm'n v. G. Weeks Securities, Inc.,* 483 F.Supp. 1239, 1245 (W.D.Tenn.1980). The T-bond futures in this case were apparently traded on the Chicago Board of Trade. Arising from trades on a formally organized futures exchange, claims brought in this case fall under exclusive CFTC jurisdiction.

■ We have found no case that holds exactly on the issue of whether T-bond futures are governed by securities laws. Few cases have decided whether other types of government instruments are governed by securities laws. The Seventh Circuit considered the applicability of securities laws to GNMA forwards in *Abrams v. Oppenheimer Govt. Securities, Inc.,* 737 F.2d 582 (7th Cir.1984). *Abrams* held that GNMA forwards, which "by definition are traded through party-to-party negotiation (over the counter), unlike futures which are traded on an organized exchange," are governed by federal securities laws. *Id.* at 590. The *Abrams* court expressly declined to extend its holding to futures. *Id.* at 593. Earlier, the Seventh Circuit had considered GNMA options. In *Board of Trade of City of Chicago v. SEC,* 677 F.2d 1137 (7th Cir.1982), the Chicago Board of Trade sued the SEC in a dispute about who could regulate GNMA options, and the Seventh Circuit concluded that the CFTC had exclusive jurisdiction. The Seventh Circuit held that the statutory clause saying "nothing in this

---

1. This conclusion is bolstered by subsequent language explaining the 1978 Futures Trading Act:

> Recent experience also supports the wisdom of Congress' decision in 1974 to expand the scope of commodities that could become the subject of regulated futures trading.... [F]utures contracts on financial instruments —... Treasury bonds and Treasury bills— are among the most active new contracts currently traded.... The comprehensive framework for exchange-related futures contracts

on an ever-expanding number of commodities established in the [Act] of 1974 has worked well.

1978 U.S.Code Cong. & Admin.News 2101–02. Further bolstering appears in legislative history from the 1982 amendments to the Futures Trading Act: "The CFTC also *retains* its exclusive jurisdiction over the trading on boards of trade of futures contracts (or options on futures contracts) on securities issued or guaranteed by the United States Government...." 1982 U.S. Code Cong. & Admin.News 3888 (emphasis added).

section shall supersede or limit [SEC] jurisdiction" applied "except where SEC jurisdiction is divested by the CFTC exclusive jurisdiction clause." *Id.* at 1145–46. The opinion relied on legislative history showing that Congress repeatedly rejected amendments proposed by the SEC that would have narrowed the exclusive jurisdiction clause. *Id.* at 1149–50.

Two district courts have held that securities laws apply to T-bill futures. In *Paine, Webber, Jackson & Curtis, Inc. v. Conaway,* 515 F.Supp. 202 (N.D.Ala.1981), the court held that fraud provisions of the Securities Exchange Act apply to T-bill futures, based on a finding that the 1974 Amendments contained "no indication of Congressional intent to narrow the broad scope of protection afforded the public by the antifraud provisions of Rule 10b–5." *Id.* at 210 n. 5. With reliance on *Conaway* and no mention of the 1974 Amendments, a similar conclusion was reached in *Fisher v. Dean Witter Reynolds,* 526 F.Supp. 558, 559–60 (E.D.Pa.1981) (securities antifraud provisions apply to GNMA futures and T-bill futures). We disagree with the position taken in these cases.

We instead agree with the extensive reasoning in *Mallen v. Merrill Lynch, Pierce, Fenner & Smith,* 605 F.Supp. 1105 (N.D. Ga.1985), which held that an action regarding stock index futures raised no claim under federal or state securities laws. We find that the same reasoning and legislative interpretation applies to T-bond futures. A different result would "defeat[ ] the fundamental congressional design in revamping the Commodity Exchange Act in 1974 and granting exclusive jurisdiction to the new CFTC—to avoid a duplicative or contradictory regulatory structure." *Id.* at 1114; *see also Securities & Exchange Comm'n v. American Commodity Exchange,* 546 F.2d 1361, 1369 (10th Cir.1976) ("Congressional intent to avoid overlapping").

### B. Florida Securities Claims

We have found no case in which Florida's securities law has been applied to the trading of futures of government securities. The Florida Securities Act, Fla.Stat. Ann. § 517.011 *et seq.* (West Supp.1988), is, however, patterned after the federal securities laws. *Silverberg v. Paine, Webber, Jackson & Curtis,* 710 F.2d 678, 690 (11th Cir.1983). Florida courts have looked to interpretations of the federal securities laws for guidance in interpreting Florida's securities law. *See, e.g., Rudd v. State,* 386 So.2d 1216 (Fla.App.1980) (adoption of federal test to determine whether transaction constitutes security or "investment contract"); *Zelman v. Cook,* 616 F.Supp. 1121, 1127 (S.D.Fla.1985) ("federal securities law cases are highly persuasive in construing Florida's securities law"). The Florida securities antifraud provision, Fla. Stat.Ann. § 517.301(1)(a), (b) (West Supp. 1988), follows almost verbatim the wording of the federal antifraud provision, 15 U.S. C.A. § 77q. The explanatory notes for the various sections of the Florida Securities Act amply cross-reference federal securities regulation.

The Florida Supreme Court, in *Oppenheimer & Co. v. Young,* 456 So.2d 1175, 1178 (Fla.1984), said:

> [W]e are persuaded that it was the intent of the legislature, in enacting the Florida Securities Act, to rely on federal laws and enforcement efforts in the securities field and to cooperate with those efforts in formulating Florida law.... [T]he legislature intended that Florida securities laws be hand-in-glove with federal securities laws and that Florida purchasers of securities be granted the full range of civil remedies offered by both Florida and federal securities laws.

Although the Florida courts have not expressly said that a curtailment of the reach of the federal securities laws correspondingly curtails the reach of the state securities law, we conclude, in accordance with Florida's legislative intent, that Florida's securities law does not cover securities futures.

As in the federal domain, the state laws regarding securities were enacted prior to the emergence of trading in futures of securities on formal commodity exchanges. The 1974 Amendments that came in re-

sponse to the burgeoning of instruments traded would seem as relevant to Florida's regulation as to federal regulation of securities trading. The Florida legislature in passing Florida's original securities law intended to encompass future changes in federal law: "The same civil remedies provided by laws of the United States now or *hereafter in force,* for the purchasers of securities under any such laws, in interstate commerce, shall extend also to purchasers of securities under [the] Laws of Florida...." Chapter 16174, Section 5, Laws of Florida (1933). To the extent that the Florida legislature sought to track the federal securities laws, the trading of securities futures would seem to fall outside the realm of both state and federal securities regulation for the reasons given in Section A of this opinion.[2]

### C. Federal Commodities Claims

■ The district court entered a judgment n.o.v. on Messer's Commodity Exchange Act (CEA) claim on the ground that fraud claims based upon promises of future action are not actionable under Florida law. It is clear that under certain circumstances a false promise to perform future services can support a claim under the CEA's antifraud provisions. *See Apache Trading Corp. v. Toub,* 816 F.2d 605, 610 (11th Cir.1987). Accordingly, we disagree with the district court's grounds for disposing of Messer's CEA claim. We, however, affirm the result reached by the district court on different grounds.

Messer's claim under the Commodity Exchange Act is brought under Section 6*o* (1), which states:

(1) It shall be unlawful for any commodity trading advisor ...

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C.A. § 6*o* (1) (West 1980).

■ Messer's claim under Section 6*o* (1) presents two possible grounds for liability: the opening of the account and the unauthorized trades. Neither the Supreme Court nor this Circuit has addressed the question of whether Section 6*o* (1) of the CEA contains a *scienter* requirement. After reviewing the language of the provision, interpretations of analogous statutes, and the sparse legislative history that accompanies Section 6*o* (1), we conclude that Section 6*o* (1)(A) contains the same *scienter* requirement as Section 10(b) and Rule 10b–5 of the federal securities laws, while Section 6*o* (1)(B) does not require proof of *scienter.*

The focus of our analysis is the language of Section 6*o*. Because the case law indicates that subsections (A) and (B) under Section 6*o* (1) should be analyzed differently, we will discuss each subsection separately. Section 6*o* (1)(A) prohibits financial advisers from "employ[ing] any device, scheme, or artifice to defraud any client." This language closely tracks two other antifraud provisions, Section 17(a)(1) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a)(1), and Section 206(1) of the Investment Advisers Act (IAA), 15 U.S.C.A. § 80b–6(1). Both of these analogous provisions have been interpreted by binding precedent as requiring the same proof of

2. We are helped in this conclusion by more recent Florida legislation. Not until recently did Florida provide express antifraud provisions for commodities trading. In 1984, it became unlawful in Florida "for any person to engage in any act or practice in or from this state, which act or practice constitutes a violation of any provision of the Commodity Exchange Act ... or the rules and regulations of the Commodity Futures Trading Commission under that act upon the effective date of this act." Fla.Stat. Ann. § 517.275 (West Supp.1988). Although the

trades in this case took place in 1981, the 1984 legislation provides retrospective guidance. The legislative statement fully adopting for Florida the federal scope of commodities, coupled with prior express statements that the federal scope of securities legislation would be relevant to Florida, leads to the conclusion that the trading of futures of securities in 1981 did not fall under the Florida securities antifraud provisions. *See also Mallen v. Merrill Lynch,* 605 F.Supp. at 1114 (inapplicability of both federal and state securities laws).

*scienter* as is required to establish a violation of Section 10(b) and Rule 10b–5 of the securities laws. *Aaron v. SEC,* 446 U.S. 680, 695–96, 100 S.Ct. 1945, 1954–55, 64 L.Ed.2d 611 (1980) (interpreting Section 17(a)(1) of Securities Act of 1933); *Steadman v. SEC,* 603 F.2d 1126, 1134 (5th Cir.1979) (interpreting Section 206(1) of Investment Advisers Act). There is nothing in the language, purpose, or legislative history of Section 6*o* (1)(A) to justify giving it a different interpretation. *See* Bromberg & Lowenfels, *Securities Fraud and Commodities Fraud* § 4.6(453). Accordingly, we conclude that proof of a violation of Section 6*o* (1)(A) requires proof of *scienter.*

Based on this interpretation of Section 6*o* (1)(A), we find that Messer's 6*o* (1)(A) claim fails because the record does not provide an evidentiary basis for a reasonable juror to find that E.F. Hutton acted with the requisite *scienter.* [3]

The Supreme Court has held that Section 10(b) and Rule 10b–5 are not violated in the absence of a showing of *scienter*—an intent to deceive, manipulate or defraud. *Santa Fe Industries v. Green,* 430 U.S. 462, 473–74, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976); *see also Gochnauer v. A.G. Edwards & Sons,* 810 F.2d 1042, 1046 (11th Cir.1987); *cf. Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980) (SEC required to prove *scienter* in actions to enjoin violations of Section 10(b) and Rule 10b–5). This Circuit has held that the *scienter* requirement in securities fraud cases can also be satisfied with a showing of knowing misconduct or severe recklessness.[4] *Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004, 1010 (11th Cir.1985); *Kennedy v. Tallant,* 710 F.2d 711, 720 (11th Cir.1983). Severe recklessness and knowing misconduct are limited to "those highly unreasonable omissions or misrepresentations that involve not merely simple or inexcusable negligence, but an extreme departure from the standards of ordinary care." *Woods, supra,* 765 F.2d at 1010 (quoting *Broad v. Rockwell International Corp.,* 642 F.2d 929, 961–62 (5th Cir.) (*en banc*), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)). In applying this *scienter* requirement in the context of unauthorized trading on an account, we agree with the Ninth Circuit's opinion in *Brophy v. Redivo,* 725 F.2d 1218, 1221 (9th Cir.1984), that an unauthorized trade does not violate the antifraud provisions of the Securities Exchange Act unless it is accompanied by an intent to defraud or a willful and reckless disregard of the client's best interests. 725 F.2d at 1220–21; *see, e.g., Shemtob v. Shearson, Hammill & Co.,* 448

---

**3.** We take note that our decision on this question conflicts with the only other reported opinion by a United States Court of Appeals addressing this question, *Commodities Futures Trading Commission v. Savage,* 611 F.2d 270 (9th Cir. 1979). In that case the Ninth Circuit held that Section 6*o* does not contain a *scienter* requirement by analogizing to the Supreme Court's reasoning in *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), 611 F.2d at 284. We depart from the Ninth Circuit's interpretation of Section 6*o* (1) on several grounds. First, that opinion did not make a distinction between Sections 6*o* (1)(A) and 6*o* (1)(B) and in so doing, failed to note that the decision in *Capital Gains* interprets only the provision of the Investment Advisers Act analogous to 6*o* (1)(B). *See Capital Gains, supra,* 375 U.S. at 195, 84 S.Ct. at 284. Second, the opinion predates the Supreme Court's decision in *Aaron v. SEC,* which drew a distinction between Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933, analogous to Section 6*o* (1)(A) and 6*o* (1)(B) respectively, and held that

Section 17(a)(1) contained a *scienter* requirement while Section 17(a)(2) did not. Third, the Ninth Circuit's reasoning in concluding that there is no *scienter* requirement for Section 6*o,* to the extent it applies to Section 6*o* (1)(A), is inconsistent with the reasoning in *Steadman,* a case decided by our predecessor Circuit interpreting Section 206(1) of the Investment Advisers Act. In *Steadman,* the former Fifth Circuit rejected the argument that the fiduciary relationship protected by the IAA dictated that Section 206(1) of the IAA did not require proof of *scienter,* and held that the clear language of the provision covered only intentional or willful conduct. For these reasons we disagree with the Ninth Circuit's analysis to the extent it applies to Section 6*o* (1)(A) and is inconsistent with our reasoning here.

**4.** The Supreme Court expressly declined to decide the question of whether the Section 10(b)'s *scienter* requirement could be satisfied by extreme recklessness. *Ernst & Ernst, supra,* 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12.

F.2d 442, 445 (2d Cir.1971); *cf. Lincoln Commodity Services v. Meade,* 558 F.2d 469, 474 (8th Cir.1977).

■ A review of the record persuades us that no reasonable juror could have concluded that E.F. Hutton made the unauthorized trades with the requisite *scienter.* The record shows that E.F. Hutton made the unauthorized trades because the value of Messer's T-bond holdings was dropping precipitously and it wanted to protect the account. The record also shows that the trades were made without Messer's authorization because he was out of town and could not be reached at the time the decision had to be made. While opinions might differ on whether or not the decision to straddle the account was a good business decision, the expert testimony at trial established that straddling an investment is a common and accepted industry practice to protect an account against extreme losses. Far from supporting a finding that E.F. Hutton made the unauthorized trades with intent to defraud or reckless disregard for Messer's best interest, it appears that Hutton made a reasonable decision well within the bounds of accepted industry practice designed to protect the account.

Messer argues that a reasonable jury could have found that E.F. Hutton acted in reckless disregard of his interests because there was evidence that E.F. Hutton was motivated by a desire to protect itself. There is no real dispute that Hutton did in fact act to protect its own interests; however, that does not mean that in so doing E.F. Hutton acted in reckless disregard of Messer's interests. E.F. Hutton, who would have been liable for any margin call on Messer's investment, attempted to protect itself from liability by preventing a decline in the value of Messer's portfolio. Accordingly, Hutton's interests and Messer's interests were aligned rather than being antagonistical. While Messer now claims that the actions were not in fact in his interest, that does not alter the fact that the actions were not *taken* in disregard of his welfare. We conclude that no reasonable jury could have found that E.F. Hutton acted with the requisite *scien-*

*ter* and accordingly that the jury verdict in favor of Messer on his securities act claim cannot stand.

■ The language of Section 6*o* (1)(B) reads slightly differently, prohibiting advisers from "engag[ing] in any transaction, practice, or course of business which *operates as* a fraud or deceit upon any client."* (Emphasis added.) This language tracks Section 17(a)(3) of the Securities Act of 1933 and Section 206(2) of the Investment Advisers Act, which have been interpreted as not requiring proof of *scienter. Aaron,* 446 U.S. at 697, 100 S.Ct. at 1956 (interpreting Section 17(a)(3) of Securities Act of 1933); *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963) (interpreting Section 206(2) of IAA); *see also Steadman,* 603 F.2d at 1134 (Section 206(2) of IAA). These courts reasoned that the phrase "operates as" focused the force of the prohibition on the effect of the action rather than on the actor's state of mind, thereby indicating that Congress did not intend to require proof of *scienter* to establish a violation. *Aaron,* 446 U.S. at 697, 100 S.Ct. at 1956; *Capital Gains,* 375 U.S. at 195, 84 S.Ct. at 284. Again, we find no reason to distinguish the interpretations of these analogous statutory provisions from the interpretation of Section 6*o* (1)(B).

Even with this interpretation of Section 6*o* (1)(B), we conclude that no reasonable juror could have concluded that E.F. Hutton's actions in placing the straddle on Messer's account in fact "operate[d] as a fraud or deceit" upon Messer. Even given that E.F. Hutton breached its contract with Messer, as the jury found, it does not necessarily follow that the breach of contract operated as a fraud or deceit on Messer. The facts and circumstances surrounding the transactions do not establish a course of unauthorized trading taking place during normal market conditions, *see, e.g., Haltmier v. Commodities Futures Trading Comm'n,* 554 F.2d 556, 562 (2d Cir. 1977), or a "churning" case where excessive trading is carried out in order to generate commissions, *see e.g., Thompson v. Smith Barney, Harris Upham & Co.,* 709

F.2d 1413, 1416–17 (11th Cir.1983), both situations which do involve deceit and fraud. In contrast, E.F. Hutton made two isolated trades within a short period of time in response to what it reasonably perceived to be a dangerously dropping market. While it undeniably made the trades without Messer's authorization, it did so at least in part because Messer was not available to authorize the trades or otherwise respond to the changing market situation. Messer was notified as soon as it was possible to notify him that the trades had in fact been made and was given the opportunity to restore the account to its original condition by posting the required margin. In addition, as previously noted, E.F. Hutton offered to waive its commission on the trades. No reasonable juror could conclude that these facts amount to fraud or deceit. Accordingly, we AFFIRM the district court's entry of a judgment n.o.v. on Messer's CEA claim.